ORIGINAL

USDC SDNY
DOCUMENT
ELECTRONICALLY FILED
DOC #:_____
DATE FILED: 12/20/18

UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK

**CADDELL CONSTRUCTION CO. (DE), LLC,**

                Plaintiff,

    - against -

**DANMAR LINES LTD.,**

                Defendant.

18 Civ. 2900 (LLS)

**OPINION & ORDER**

Defendant Danmar Lines Ltd. ("Danmar") moves, pursuant to Fed. R. Civ. P. 56, for partial summary judgment in its favor against Plaintiff Caddell Construction Co. (DE), LLC ("Caddell"). For the reasons that follow, the motion is granted.

## BACKGROUND

Defendant Danmar is a common carrier of goods licensed by the United States Federal Maritime Commission. Covington Decl. (Dkt. No. 19-1) ¶ 2; Bullock Decl. (Dkt. No. 19-2) ¶ 2. Plaintiff Caddell is a general contractor that provides construction services. Ranieri Decl. (Dkt. No. 16-1) ¶ 1. In or around the summer of 2014, Caddell hired Danmar for its freight forwarding services. Id. ¶ 2.

Between the summer of 2014 and September of 2016, the parties discussed, negotiated, and revised drafts of a contract ("Purchase Order") that would govern their relationship. Id. ¶¶ 2-7. On May 7, 2015, Joe Silver, a Business Development Manager at Danmar, emailed to Caddell's Vice President of

-1-

Finance and Risk Management, Mike Ranieri, an "updated draft" of the Purchase Order. Id. ¶ 3; Ex. 1. The parties annotated the drafts with comments and objections, and met to discuss the terms. Id. ¶¶ 3-4.

On June 9, 2015, Mike Ranieri emailed to Joe Silver an updated version of the Purchase Order incorporating the revisions that the parties agreed to at the previous meeting. Id. ¶ 5; Ex. 2. The email stated, "Please look over it and give me your comments. Again, we are trying ot [sic] get all language into 1 document rather than have multiple conflicting documents to sort through." Id. The last page of the Purchase Order Rider "attached to and made a part of the Purchase Order" included two blank signature lines: one for Caddell and one for "DHL Global Forwarding," a trade name for Danmar. Pl.'s Resp. to Def.'s Statement of Undisputed Material Facts (Dkt. No. 38) Ex. 1; Covington Decl. ¶ 1; Bullock Decl. ¶ 1.

On September 9, 2016, Joe Silver's replacement, James Bullock, emailed Ugur Ersoy, a Caddell employee, stating, "I have reengaged our lawyers to revisit the last contract you sent me. It should be back in your hands in less than 30 days." Ranieri Decl. ¶ 7; Ex. 3. Due to an unresolved issue with a warehouse insurance requirement, the Purchase Order was never finalized, signed, or executed. Id. ¶ 6; Covington Decl. ¶¶ 5-6; Bullock Decl. ¶¶ 5-6.

In or about August of 2016, Danmar agreed to transport Caddell's twenty-eight air handling units in ten shipments from Norfolk, Virginia to a United States Embassy in Kabul, Afghanistan. Ranieri Decl. ¶ 9; Compl. (Dkt. No. 1-1) ¶ 6. Consistent with standard practice, Danmar issued its standard bills of lading for the shipments. Covington Decl. ¶ 10; Bullock Decl. ¶ 10.

The shipments from Norfolk, Virginia were off-loaded from the vessel in Karachi Port, Pakistan in good condition. Ranieri Decl. ¶ 9. The goods were then carried on trucks from Karachi Port, Pakistan to Kabul, Afghanistan, and were delivered, with seventeen packages damaged, between October 30, 2016 and December 8, 2016. Id.; Compl. ¶ 7; Def.'s Statement of Undisputed Material Facts (Dkt. No. 36) Ex. 3.

Danmar's bill of lading form is publicly filed with and approved for use as a contract of carriage by the United States Federal Maritime Commission. Covington Decl. ¶ 3; Bullock Decl. ¶ 3. The Bills of Lading name Caddell as the shipper and DHL Global Forwarding as the forwarding agent. Def.'s Statement of Undisputed Material Facts Ex. 1. The Bills of Lading list the port of loading as "Norfolk, VA," the port of discharge as "Muhammad Bin Qasi," and the place of delivery as "Kabul." Id.

The Bills of Lading's Terms and Conditions identify Danmar as the Carrier and Caddell as the Shipper. Id. Ex. 2 ("Terms and

Conditions") ¶ 1.1. The Terms and Conditions define "US Carriage" as "any carriage to, from and/or through the jurisdiction of the U.S.A," and "Non US Carriage" as "any element of the Services which is not US Carriage." Id.

The Terms and Conditions' "Law and Jurisdiction" section states that for U.S. Carriage,

> The contract evidenced by or contained in this bill of lading or otherwise arising from the Carriage or in relation to the Goods shall be governed by and construed in accordance with the laws of the United States of America and particularly 28 USC Section 1300 et seq. of US COGSA. Any claim against the Carrier under this bill of lading or otherwise arising from or in relation to the Services or the Goods shall be determined exclusively by the United States District Court for the Southern District of New York to whose jurisdiction the Merchant irrevocably submits.

Id. ¶ 14.2.[1] For Non U.S. Carriage,

> The contract evidenced by or contained in this bill of lading or otherwise arising from the Services or in relation to the Goods shall be governed by and construed in accordance with the laws of England. Any claim against the Carrier under this bill of lading or otherwise arising from the Services or in relation to the Goods shall be determined exclusively by the courts of England to which jurisdiction the Merchant hereby irrevocably submits.

Id. ¶ 14.1. The "Carrier's Liability" section states,

> 8.1.1 in the case of US Carriage, an international convention or national law (including US COGSA) compulsorily applies (US Compulsory Legislation), in which case the liability of the Carrier will be determined and limited in accordance with the provisions of such US Compulsory Legislation;

---

[1] The Terms and Conditions define "US COGSA" as "the United States Carriage of Goods by Sea Act 16 April 1936." The Terms and Conditions incorrectly cite COGSA as "28 USC Section 1300 et seq." COGSA was previously codified at 46 U.S.C. §§ 1300-1315. In 2006, Congress recodified Title 46 of the U.S. Code, and COGSA was uncodified but reprinted at 46 U.S.C. § 30701, historical and statutory notes. See Pub. L. No. 109-304, 120 Stat. 1485 (2006).

> 8.1.2 in the case of Non US Carriage an international
> convention or national law applies compulsorily to any element
> of the Services (Non US Compulsory Legislation), in which case
> the liability of the Carrier in relation to that element of
> the Services will be determined and limited in accordance with
> the provisions of such Non US Compulsory Legislation;

Id. ¶ 8.1. The sub-section "Amount of compensation" under "Carrier's Liability" further specifies,

> If the Carrier is liable for loss of or damage to the Goods
> the liability of the Carrier shall be limited to the lesser
> of:
>
> 8.3.1  the arrived sound market value of only those Goods
> damaged or lost (excluding insurance); and
>
> 8.3.2  for Non US Carriage to which Compulsory Legislation
> applies, the amount set out in such Compulsory Legislation;
>
> 8.3.3  for Non US Carriage to which no Compulsory Legislation
> applies, 2SDRs per kilo;
>
> 8.3.4  for US Carriage, US $500 per Package or per the freight
> unit billed for Goods not packaged.

Id. ¶ 8.3. The sub-section "Ad valorem" under "Carrier's Liability" states:

> Where the Shipper has declared a value for the Goods and the
> Carrier has stated such value on the front of this bill of
> lading as a "declared value", and provided the Shipper has
> paid the extra freight, the amount of the declared value shall
> be substituted for the limits laid down in this bill of
> lading. Any partial loss or damage shall be adjusted pro rata
> on the basis of such declared value.

Id. ¶ 8.4.

Caddell brought suit in state court in Harris County, Texas, and Danmar removed the case to the Southern District of Texas. Danmar then moved to transfer the case to this district. On March 29, 2018, Chief United States District Judge Lee H. Rosenthal of the Southern District of Texas granted Defendant's

motion to transfer.

**DISCUSSION**

<u>Standard for Summary Judgment</u>

"The court shall grant summary judgment if the movant shows that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(a). "A fact is material if it 'might affect the outcome of the suit under the governing law,' and a dispute is genuine if 'the evidence is such that a reasonable jury could return a verdict for the nonmoving party.'" <u>Baldwin v. EMI Feist Catalog, Inc.</u>, 805 F.3d 18, 25 (2d Cir. 2015) (quoting <u>Anderson v. Liberty Lobby, Inc.</u>, 477 U.S. 242, 248, 106 S. Ct. 2505, 2510 (1986)). "In looking at the record, we construe the evidence in the light most favorable to the nonmoving party and draw all inferences and resolve all ambiguities in favor of the nonmoving party." <u>Dalberth v. Xerox Corp.</u>, 766 F.3d 172, 182 (2d Cir. 2014) (quoting <u>In re Omnicom Group, Inc. Sec. Litig.</u>, 597 F.3d 501, 509 (2d Cir. 2010)).

<u>The Governing Contract of Carriage</u>

Danmar moves for partial summary judgment on the grounds that the Bills of Lading govern the relationship between the parties, and that Danmar's liability is therefore limited to $500 per package. Caddell argues that the Purchase Order, which does not contain a $500-per-package limitation, governs the

-6-

parties' relationship. Danmar asserts that Caddell cannot now re-litigate the issue because the Southern District of Texas decision granting Danmar's motion to transfer already found that the Bills of Lading govern the parties' relationship and is thus the law of the case. Def.'s Mem. at 3.

The parties' debate about whether Chief Judge Rosenthal's decision on that point is the law of the case, and to what extent it binds me, is spirited but immaterial since I would in any event hold that the Bills of Lading govern this case.

Caddell argues that the Purchase Order is a separate contract governing the parties' relationship, and that the Bills of Lading were thus "mere receipts" of the shipments. However, while the Purchase Order was discussed and negotiated over, it was never signed or executed, and there is no evidence of a meeting of the minds with intention to be bound by a draft of the Purchase Order. Covington Decl. ¶ 5; Bullock Decl. ¶ 5.

"Ordinarily, where the parties contemplate further negotiations and the execution of a formal instrument, a preliminary agreement does not create a binding contract." Missigman v. USI Northeast, Inc., 131 F. Supp. 2d 495, 507 (S.D.N.Y. 2001). "When the wording and sense of letters exchanged between the parties reveal no present intent to form a binding contract, but rather to continue negotiations with the possible ultimate meeting of the minds deferred until some

future time, either party may withdraw with impunity prior to that time." Id. (citation and internal quotation marks omitted).

The parties discussed and negotiated about the Purchase Order for over two years. Ranieri Decl. ¶¶ 2-7. The statements made in the emails exchanged between the parties, such as "Attached updated draft," "Please look over it and give me your comments," "I have reengaged our lawyers to revisit the last contract you sent me," and "It should be back in your hands in less than 30 days" demonstrate the parties' intent to continue revising and negotiating the Purchase Order. See PCS Sales (USA), Inc. v. Nitrochem Distribution Ltd., No. 03-CV-2625 (SAS), 2004 WL 944541, at *5 (S.D.N.Y. May 3, 2004) (finding that "[t]he parties clearly did not consider themselves bound by the terms in the 2001 drafts" because they "continued actively to negotiate until at least June," "continued to trade drafts, albeit sporadically, until the end of October 2001," and "never abandoned the objective of obtaining a written agreement").

The Purchase Order Rider's two blank signature lines demonstrate that the parties intended to sign and execute the Purchase Order before it would take effect as a binding contract. See Longo v. Shore & Reich, Ltd., 25 F.3d 94, 97 (2d Cir. 1994) (finding that a letter requiring both parties to sign "evidenced an intent that the parties would not be bound to the terms of their negotiations until the agreement was signed");

Newby v. News Market, Inc., 170 F. App'x 204, 206 (2d Cir. 2006)
(finding that the parties "intended to be bound only upon
signature of the agreement by both parties" because the proposed
agreement contained blank lines for the signatures and
instructed plaintiff to sign and return it to defendants).
Neither party signed any version of the Purchase Order.

Nor is there any evidence that the parties operated under
the Purchase Order's terms and rates, as Caddell claims. The
September 9, 2016 email exchange between James Bullock and Ugur
Ersoy that Caddell points to merely shows that the parties
discussed the terms of detention and storage charges in the
Purchase Order, not that they resolved a dispute "pursuant to
the provisions of the Purchase Order." Ranieri Decl. ¶ 6. James
Bullock's email stated,

> I have reengaged our lawyers to revisit the last contract you
> sent me. It should be back in your hands in less than 30 days.
> Also we spoke about detention charges that DHL said is owed to
> them. You stated if we can provide proof of the charges we can
> possible [sic] get paid on them. What exact proof are you
> looking for?

Id. Ex. 3. Ugur Ersoy emailed in response,

> Our terms are door to door therefore DHL can only bill
> detention and storage charges when the delay is caused by an
> incident beyond your control such as strike, border closure
> etc. . . . In order to pay you for detention and storage, you
> have to provide back up of the reason such as press
> releases . . . .

Id. James Bullock's reply, "Ok thanks . . . Stand by on that
front" deferred any agreement to operate under the terms

proposed in either the Purchase Order or Ugur Ersoy's email.

The parties were not bound by a draft of the Purchase Order or any other separate contract, and the Bills of Lading control.[2]

Application of COGSA and the $500-per-Package Limitation

Danmar argues that because the shipments are U.S. Carriage, the Bills of Lading are "governed by and construed in accordance with the laws of the United States of America and particularly" the Carriage of Goods by Sea Act ("COGSA"), 46 U.S.C. § 30701. Terms and Conditions ¶ 14.2. Caddell argues that COGSA does not apply because the inland segment of the carriage from Karachi Port, Pakistan to Kabul, Afghanistan is "Non US Carriage," which "shall be governed by and construed in accordance with the laws of England." Id. ¶ 14.1.

Caddell's argument implies that U.S. law should apply if the shipments were damaged at sea between the United States and Pakistan, and English law should apply if the shipments were damaged between Pakistan and Afghanistan. The Bills of Lading's Terms and Conditions give no reason to suppose that they distinguish between the different stages of carriage from

---

[2] Caddell's claim that the Bills of Lading's Terms and Conditions "post-date the subject shipments" and thus cannot apply (Pl.'s Mem. at 7-8) is incorrect. The dates listed on the Bills of Lading (3/08/16, 2/08/16, 5/08/16, 12/08/16, 19/08/16, 16/09/16, 8/09/16, 10/09/16, and 23/09/16) are abbreviated in the European format of day/month/year. The date on the Terms and Conditions are abbreviated in the same manner, with 12/7/2016 as July 12, 2016, and thus do not post-date the shipments. Erener Decl. (Dkt. No. 40-1) ¶ 4.

Norfolk to Kabul. The Karachi to Kabul leg is not a separate trip or shipment, but an integral and necessary part of the carriage from Norfolk to Kabul, governed by the same conditions and terms as the rest. They state that for U.S. Carriage, defined as including carriage "from . . . the jurisdiction of the U.S.A.", "[a]ny claim against the Carrier under this bill of lading or otherwise arising from or in relation to the Services or the Goods shall be determined exclusively by the United States District Court for the Southern District of New York" under U.S. law, id. ¶¶ 1.1; 14.2, with no contemplation of the application of English law to a particular part of what is described as "cargo in transit to Afghanistan via Karachi Pakistan." Def.'s Statement of Undisputed Material Facts, Ex. 1, p. 1 ("Specification of Cargo").

Thus, Danmar's liability is limited to $500 per package because both COGSA and the Terms and Conditions contain a provision limiting Danmar's liability. COGSA limits a carrier's liability "for any loss or damage to or in connection with the transportation of goods" to "$500 per package." 46 U.S.C. § 30701, note § 4(5). The provision in the Terms and Conditions states that for U.S. Carriage, the Carrier's liability for damage to goods is "limited to the lesser of" the "arrived sound market value" of the damaged or lost goods and "US $500 per Package . . . ." Terms and Conditions ¶ 8.3. The Bills of Lading

provided that the shipper could obtain a higher valuation, by specifying it and paying a higher price. Id. ¶ 8.4.

Accordingly, Danmar's liability is limited to $500 per package.

**CONCLUSION**

Danmar's motion for partial summary judgment (Dkt. No. 35) limiting Caddell's potential recovery to $8,500 is granted.

So ordered.

Dated:   New York, New York
         December 20, 2018

*Louis L. Stanton*
LOUIS L. STANTON
U.S.D.J.